**SO ORDERED.**

**SIGNED this 6th day of November, 2018.**



Dale L. Somers
United States Chief Bankruptcy Judge

### Designated for print publication

---

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

In re:

**Regional Evangelical Alliance of Churches, Inc.,**

               **Debtor.**

**Case No. 18-11065**
**Chapter 11**

### Memorandum Opinion and Judgment Granting
### Karbank Holdings, LLC's Motion to Dismiss

The question is whether this case was filed in good faith. Karbank

Holdings, LLC (Karbank), a creditor of Debtor Regional Evangelical Alliance

of Churches, Inc. (Debtor), alleges that it was not and has moved to dismiss

this case, or alternatively for relief from stay (the Motion).[1]  Prepetition

---

[1] Doc. 25. This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of Reference of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order No. 13-1, printed

Karbank sued Debtor and others in state court to enforce a Right of First Negotiation and First Refusal Agreement (Rights Agreement) with Debtor, which granted Karbank certain rights to purchase real property owned by Debtor. The state court found that the Rights Agreement had been breached by Debtor's transfer of the Property to Diversified Acquisitions, Inc. (Diversified). Before the court ruled on the remedy to which Karbank was entitled, which the parties anticipated would have allowed Karbank to purchase the property for considerably less than market value, Diversified transferred the property to Debtor. The next day, Debtor filed for relief under Chapter 11. Karbank responded with the Motion.

An evidentiary hearing on the Motion was held on August 15, 2018.[2] At the close of trial, the Court requested the parties to brief the applicability of the Rooker-Feldman doctrine to this controversy. Those briefs have been

in D. Kan. Rules of Practice and Procedure (March 2018). A motion to dismiss and for relief from stay is a core proceeding that this Court may hear and determine as provided in 28 U.S.C.§ 157(b)(2)(A) and (G). There is no objection to venue or jurisdiction over the parties. Further, in the Pretrial Order (doc. 93) Debtor consents to the jurisdiction of the Court to hear all dispositive motions filed by Karbank, but Karbank did not consent to the jurisdiction of the Court "to the extent that the Court's orders alter or amend the orders already entered" in the state-court litigation. Doc. 93 at 2.

[2] Debtor appears by Edward J. Nazar of Hinkle Law Firm, LLC. Karbank appears by Colin N. Gothan of Evans & Mullinix, P.A. and T. Bradley Manson of Manson Karbank McClaflin. There are no other appearances.

received. After considering the record, testimony, exhibits, briefs, and arguments of counsel, the Court finds that this case should be dismissed because it  was not filed in good faith, as that term is understood in the bankruptcy context.

## I.    Findings of Fact

Debtor is "a church planting alliance, committed to planting and overseeing missional parishes (churches),"[3] which are self-sufficient churches under the authority of Debtor. Craig McElvain is the executive director of Debtor. In the summer or fall of 2013, Debtor purchased real property located at 7501 Belinder Street in Prairie Village, Kansas (the Property) for approximately $1.2 million. Approximately $950,000 of the purchase price was financed by the Bank of Prairie Village. The Property was used as a parish, known as Reach in the Village, and the down payment was financed, in part, by loans from individuals. Craig McElvain became seriously ill in late spring of 2015 and was unable to attend to the affairs of Debtor during his illness. In December 2015, Reach in the Village was dissolved. The Property ceased to be used for religious services and is not currently occupied.

On July 27, 2015, Debtor and Karbank executed a Parking Lot Lease that granted Karbank, which has offices on 75th Street across the street from

---

[3] Exh. 39 at 1.

the Property, the right to use 60 of the 350 parking spaces on the Property. Karbank paid $70,000 in lieu of periodic rent and offset the cost of repairing, repaving, and striping a portion of the parking lot.

Contemporaneous to the execution of the Parking Lot Lease, Debtor and Karbank entered into the Rights Agreement. A memorandum of the agreement was recorded with the Register of Deeds in Johnson County, Kansas. Generally, the Rights Agreement requires Debtor to give notice to Karbank of any proposed sale of the Property and granted Karbank an exclusive right for a period of 30 days after such notice to give notice that it would purchase the Property on the terms in the offer.

The Parking Lot Lease and the Rights Agreement were signed by three individuals, as Trustees of Debtor. David Christie was one of those trustees. David Christie also negotiated both agreements on behalf of Debtor. Craig McElvain and David Christie have been friends since childhood.

In the fall of 2015 it was determined that the unoccupied Property should be sold or leased. On November 1, 2015, Debtor entered into a Commercial Exclusive Right to Represent Seller/Landlord Agreement with Christie Development Associates, LLC, a company wholly owned by David Christie. It granted Christie Development the exclusive right to market and sell the Property for the period beginning on November 1, 2015 through

4

February 1, 2017 for the price of $1.5 million. After December 2015, David Christie took over management of the Property.

In the fall of 2016, Debtor's loan from the Bank of Prairie Village (the Bank) was maturing, and the Bank gave notice that it would not renew the obligation. David Christie negotiated with the Bank for Diversified, a company owned 80% by David Christie and 20% by Matt Pennington, to purchase the loan for the outstanding balance of $909,163.24. The Bank and Diversified entered into a Loan Sale Agreement dated November 6, 2015, and an amendment of that agreement extending the closing date to December 28, 2015. The transaction closed, and the note, together with the security documents, were transferred to Diversified.

On December 28, 2015, Diversified and Debtor entered in to a Loan Modification and Deed-in-Lieu Agreement. It extended the maturity date of the loan, then owned by Diversified, to May 1, 2016. Executed but undated copies of a Special Warranty Deed in Lieu of Foreclosure transferring ownership of the Property from Debtor to Diversified and an Affidavit Regarding Deed in Lieu of Foreclosure were attached as exhibits to the agreement. The affidavit recites that the deed- in-lieu is an absolute conveyance of title to the Property and is not intended as a mortgage, that

5

Debtor acted freely and voluntarily, and that the value of the consideration was equal to or greater than the value of the Property.

From December 28, 2015 to June 1, 2016, attempts were made to sell the Property to a religious organization, but no qualified buyers were located. On June 1, 2016, the modified note was in default and Diversified, in lieu of foreclosure, was granted title to the Property. The Special Warranty Deed-In-Lieu of Foreclosure was dated June 1, 2016 and filed with the Johnson County Register of Deeds on June 17, 2016.

Approximately two weeks later, on July 1, 2016, Pendev, LLC, owned 100 % by Matt Pennington, who also had a 20% interest in Diversified, offered to purchase the Property from Diversified for $2.1 million. The purchase contract states that closing was subject to waiver by Karbank of its rights under the Rights Agreement. On July 1, 2016, Christie Development sent a letter to Karbank, stating it was giving notice of a proposed sale as required by the Rights Agreement and enclosing a copy of the Pendev contract. Karbank requested a title commitment and became aware of the transfer of the Property from Debtor to Diversified.

On July 29, 2016, Karbank filed a Petition for Temporary Restraining Order, Injunction and Damages in Johnson Court District Court against Debtor, Pendev, and Diversified. The counts for temporary restraining order

6

and injunction sought an order "prohibiting Diversified from conveying the ... Property to any person or entity."[4] The claims against Debtor included the allegation that the Rights Agreement was breached when the Property was transferred to by Debtor to Diversified by the Special Warranty Deed. As remedies, Karbank sought specific performance or, in the alternative, damages. A Temporary Restraining Order was issued the same day. It stated, "A order is necessary to restrain Pendev LLC and Diversified Acquisitions LLC from taking any further action regarding the sale and purchase of the ... Property."[5]

A hearing on the request for injunction was set for August 5, 2016, by which time Pendev had withdrawn its offer to purchase. At that hearing, Debtor and Diversified were represented by the same counsel who stated that his clients were "not going to try to sell or do anything with the property until we figure out the answers to the questions; and we either have an agreement with the plaintiff or your judgment."[6] The court directed the parties to upload any agreement to modify the temporary restraining order, but no such order was ever presented. Debtor and Diversified engaged in almost two full years of

---

[4] Exh. 18 at 14.

[5] Exh. 19 at 2.

[6] Exh. 32 at 5.

discovery and contested litigation. Karbank, Pendev, Debtor, and Diversified all moved for summary judgment.  On March 26, 2018, the court granted Karbank's motion in part, denied Debtor's and Diversified's motions, but granted Pendev's motion.

In its memorandum decision granting Karbank' motion for summary judgment in part, the state court found that the Rights Agreement applied to the deed-in-lieu transfer from Debtor to Diversified and a breach occurred because Karbank did not receive notice as required by the Rights Agreement and did not learn of the transfer until it had the title to the Property examined after being informed of the proposed sale by Diversified to Pendev.  However, the court denied summary judgment on the remedy for breach because, under both the specific performance and damages alternatives, it "must be able to calculate the dollar amount Karbank would have been able to pay to exercise its refusal right and buy the property"[7] and it lacked sufficient facts to make that determination. On March 29, 2018, Karbank filed a supplemental motion for summary judgment stating additional facts supporting it s position that $912,444.84 was due on the loan held by Diversified when Debtor deeded the Property to Diversified.[8]  Neither Debtor nor Diversified filed a timely

---

[7] Exh. 20 at 17.

[8] Exh. 21 at 4.

8

response, and on May 11, 2018, Karbank filed a motion to deem the supplemental motion submitted for decision.

After the court's grant of summary judgment on March 26, 2018, the attorney who was counsel for both Diversified and Debtor, advised Debtor to accept a conveyance of the Property from Diversified and introduced Craig McElvain to Edward J. Nazar, an attorney who became Debtor's bankruptcy counsel. Matt Pennington, the 20% owner of Diversified, was not consulted. On May 30, 2018, Debtor, by Craig McElvain, and Diversified, by David Christie, executed a Compromise and Settlement Agreement. It defined a dispute between Debtor and Diversified arising from the June 1, 2016 transfer of the Property to Diversified by deed-in-lieu of foreclosure. It stated in part that "[t]he deed purports to convey title to the . . .Property concerning a mortgage indebtedness in the estimated sum of $912,444.84;" that the Johnson County Appraiser valued the Property at $1,919,730.00; and that Debtor intends to file a petition for relief under Chapter 11, in part, to recover the Property pursuant to § 548.[9] After describing the dispute, the settlement agreement provides that it shall be settled by conveyance of the Property to Debtor, subject to all mortgages, liens, and encumbrances of record. The

---

[9] Exh. 37 at 1-2.

9

Limited Warranty Deed conveying the Property from Diversified to Debtor was recorded on May 31, 2018.

Debtor filed for relief under Chapter 11 the following day, June 1, 2018. David Christie donated $20,000 to Debtor for payment of attorney fees. Edward J. Nazar, Debtor's bankruptcy counsel, filed an entry of appearance as counsel for Debtor in the state court. The attorney who had represented Debtor in state court continued to represent Diversified in that proceeding and entered his appearance as counsel for Diversified in this case. Notice of the bankruptcy filing was filed in state court, and the proceedings against Debtor and Diversified were stayed.

Debtor's petition states that its business is single asset real estate. Craig McElvain testified that although church services have not been held at the Property since 2015, Debtor continues to operate a seminary in Kansas City (although the seminary is no longer accredited) and a division called AIM, which develops written and internet materials. There are currently two Reach parishes in north Kansas City and house parishes in Johnson County. Attempts to plant additional parishes continues.

According to the schedules, on the date of filing, Debtor's assets, in addition to the Property valued at $1,919,730.00, were approximately $700 cash; accounts receivable of $7,000; and office equipment valued at $30,000.

10

Debtor has not filed tax returns since 2015. The claims deadline has past. Johnson County filed a $65,426.85 claim for 2017 real estate taxes. Although the IRS filed a $6,241.41 claim for FICA and withholding taxes, an amendment reduced the claim to zero. There are two wage claimants, Craig McElvain for $67,333 and David Hinkey for $2,000. A claim of $13,047.36 was filed for payment of an equipment lease. A former tenant of the Property has filed a claim for a $4,299 rent deposit. There are three claims in the total amount of approximately $104,000 for payment of promissory notes for money loaned by individuals, one of whom is Craig McElvain's mother, to Debtor in September 2012, when Debtor was raising funds for purchase of the Property. Craig McElvain has filed a proof of claim for $219,682.54 for payment of a 2104 promissory note of Reach in the Village. Diversified has filed a secured claim for $1,323,565.28, and Karbank has filed a claim for an unknown amount.

 As of the date of filing, Debtor's income for the year was less than $1,000. Debtor is seeking donations of $20,000 to maintain the Property**.** Its June and July operating reports state cash income was $989.86 and $2,757.15 and disbursements were $142 and of $487 in the respective months.

 On June 15, 2018, Karbank filed its motion for dismissal, or in the alternative, for relief from stay to pursue the state-court litigation against

Debtor. On July 11, 2018, Debtor filed its motion to reject the Rights Agreement with Karbank under 11 U.S.C. § 365[10] and for approval of bid procedures to sell the Property under § 363.

## II. Positions of the Parties

Karbank asserts that the filing of this bankruptcy is a "classic attempt to thwart a creditor's victory in state-court litigation."[11] According to Karbank, after the entry of summary judgment in its favor, Debtor abandoned the state-court litigation and attempted to reverse the conveyance giving rise to the breach by Diversified's re-deeding of the Property back to Debtor and then immediately filing for bankruptcy relief. According to Karbank, "[t]here is nothing to reorganize."[12] Karbank argues that the case should be dismissed for cause under § 1112(b) because there is: continuing diminution of the estate and the absence of a reasonable likelihood of rehabilitation; a lack of good faith; the conveyance of the Property from Diversified to Debtor on the eve of bankruptcy was a fraudulent conveyance and clear indicia of bad faith; and, in the alternative, cause exists for granting relief from the automatic stay.

---

[10] Future references to the Bankruptcy Code in the text will be to the section number only.

[11] Doc. 94 at 1.

[12] Id. at 2.

12

Debtor argues that its "purpose in filing this bankruptcy action is merely to carry out a sale of the Property at an arm's length basis to achieve the highest and best value for creditors and parties in interest."[13] According to Debtor, the practical effect of dismissal would be to return the Property to state court to allow Karbank to assert it's right to the Property at a price well below its value. But Debtor suggests this may be procedurally difficult because Debtor has acquired the Property from Diversified and effectively rendered moot the allegation that the Property was conveyed to Diversified in violation of the Rights Agreement.

## III. Discussion

### A. The Rooker-Feldman doctrine does not prohibit the Court from exercising jurisdiction.

The Rooker-Feldman doctrine "is a jurisdictional prohibition on lower federal courts exercising appellate jurisdiction over state–court judgments."[14] Its name derives from two decisions of the United States Supreme Court, Rooker v. Fidelity Trust Co.[15] and District of Columbia Court of Appeals v. Feldman.[16] The doctrine is grounded upon the reasoning that "when Congress

---

[13] Doc. 29 at 9.

[14] Campbell v. City of Spencer, 682 F.3d 1278, 1281 (10th Cir. 2012).

[15] 263 U.S. 413 (1923).

[16] 460 U.S. 462 (1983).

vested the Supreme Court with appellate jurisdiction over state-court

judgments, it implied that the lower federal courts lacked authority to review

state-court judicial proceedings."[17] In other words, no federal court other than

the Supreme Court may entertain a proceeding to reverse or modify a

judgment of a state court.

Because Debtor proposes to use this bankruptcy case to avoid the state-

court decision that it breached the Rights Agreement when it transferred the

Property to Diversified by a deed-in-lieu of foreclosure, it would seem that the

Rooker- Feldman doctrine might apply.[18] But the doctrine is very narrowly

construed. It is "confined to . . . cases brought by state-court losers

complaining of injuries caused by state-court judgments."[19] Rooker-Feldman

prohibits only an action in lower federal courts that "tries to modify or set

aside a state-court judgment because the proceedings should not have led to

---

[17] Campbell, 682 F.3d at 1281.

[18] When supporting application of the Rooker-Feldman doctrine, Karbank
argues that the doctrine precludes this Court's jurisdiction even though the state-
court ruling granting summary judgment was not a final judgement. Doc. 113 at 9-
10. The Court does not address the question of whether a final appealable
judgment is a necessary because the general principles of the doctrine demonstrate
that it is not applicable here.

[19] Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

14

that judgment."[20]  Seeking relief inconsistent with the state-court judgment is not within the doctrine. Attempts to relitigate an issue are governed by preclusion principles, not the Rooker-Feldman doctrine.[21]

When filing this case and then attempting to avoid the Rights Agreement under § 363 and to sell the Property under § 365, Debtor is not seeking to achieve results inconsistent with the state-court ruling. It is not complaining of an injury caused by the state-court ruling or arguing that the state-court ruling was erroneous. The Rooker-Feldman doctrine does not apply to divest this Court of jurisdiction.

### B. The case should be dismissed because it was not filed in good faith.

Dismissal of a Chapter 11 case is addressed by § 1112(b)(1). It provides:

> (b)(1) Except as provided in paragraph (2) [prohibiting conversion or dismissal when there are unusual circumstances] and subsection (c) [prohibiting conversion to Chapter 7 as to certain debtors], on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a)

---

[20] Mayotte v. U.S. Bank Nat'l Ass'n, 880 F.3d 1169, 1174 (10th Cir. 2018) (emphasis in original).

[21] Id. at 1175.

15

> of a trustee or an examiner is in the best interests of
> creditors and the estate.

Subsection (b)(4) is a nonexclusive list of circumstances constituting cause to dismiss, such as failure to maintain appropriate insurance that poses a risk to the estate or the public and failure to comply with an order of the court. "[A]s reflected in the enumerated bases for cause in section 1112(b)(4), the cause standard continually measures the value of maintaining the process, and also polices the diligence of the debtor or other plan proponent to ensure the process is proceeding with all deliberate speed and in accordance with the requirements of applicable law."[22] In addition, it is well established in the Tenth Circuit, and other circuits, "that a Chapter 11 petition must be filed in good faith, and if not, dismissal is an appropriate remedy."[23] "In contrast to testing the debtor's prospects of reorganization, the good faith standard focuses directly on the subjective intentions of the debtor and the proper use of the bankruptcy system."[24] A bankruptcy court's authority to dismiss a case filed in bad faith is found not only in § 1112(b) but also in a court's "inherent

---

[22] 7 Collier on Bankruptcy ¶ 1112.07[1] (Richard Levin & Henry J. Sommer eds.-in-chief, 16th ed. 2018).

[23] Pacific Rim Inv., LLP v. Oriam, LLC (In re Pacific Rim Inv., LLP), 243 B.R. 768, 771 (D. Colo. 2000) (citing Udall v. FDIC (In re Nursery Land Dev., Inc.), 91 F.3d 1414 (10th Cir. 1996)).

[24] 7 Collier on Bankruptcy at ¶ 1112.07[1].

16

authority to prevent access to the courts which would constitute an abuse of the judicial process."[25]  The requirement of good faith protects the integrity of the bankruptcy system by limiting access to its "powerful equitable weapons" to those with clean hands.[26]

Whether a bankruptcy case has been filed in good faith is a factual issue. There is no particular test for determining if a case has been filed in good faith.[27]  "Rarely do the facts of one case easily dovetail into factors created based upon the facts of a prior case."[28]  The totality of the circumstances of each case dictate the relevant considerations. One circumstance often identified when addressing the filing of cases in bad faith is the "new debtor syndrome" where property that is the subject of litigation is transferred to a

---

[25] In re Pacific Rim Inv., LLP, 243 B.R. at 771.

[26] Little Creek Dev. Co. v. Commonwealth Mortg. Co (In re Little Creek Dev. Co.), 779 F.2d 1068, 1072 (5th Cir. 1986).

[27] Compare Matter of Grieshop, 63 B.R. 657, 663 (D.N.D. Ind. 1986) (listing fourteen factors "which tend to recur in bankruptcy petitions in which good faith is an issue") with In re Nursery Land Dev., Inc., 91 F.3d at 1416 (10th Cir. 1996) (identifying seven factors that "constitute classic badges of a bad faith bankruptcy filing") and In re Forest Hill Funeral Home & Mem'l Park-East, LLC, 364 B.R. 808, 820 (Bankr. E. D. Okla. 2007) (listing eight factors but cautioning that "[w]hile the use of factors or lists ... is helpful and appears to simplify the issues, one must be wary not to become too reliant on such lists").

[28] In re Forest Hill Funeral Home & Mem'l Park-East, LLC, 364 B.R. at 821.

17

new entity and the new entity files for relief under Chapter 11 for the purpose of defeating the creditor's state law remedies.[29]

"Ultimately, '[t]he determination of whether a bankruptcy case has been filed in good faith is a matter left to the sound discretion of the bankruptcy court.'"[30] When a motion to dismiss challenges a debtor's good faith when filing the petition, the moving party must make a prima facie showing of the debtor's lack of good faith. The burden then shifts to the debtor to show good faith.[31]

### 1. Debtor filed for relief under Chapter 11 to thwart Karbank's remedy for breach of contract in the state-court action.

The transactions regarding the Property and the Rights Agreement clearly evidence Debtor's intent to use the Chapter 11 bankruptcy case as a means to defeat Karbank's state law remedies for breach of the Rights Agreement. On March 26, 2018, the state court granted summary judgment to Karbank finding that the Rights Agreement applied to the deed-in-lieu transaction whereby Diversified obtained title to the Property and that a

---

[29] Id. at 820. See In re Little Creek Dev. Co., 779 F.3d at 1073, n.3 (citing numerous "new debtor syndrome" cases).

[30] In re Forest Hill Funeral Home & Mem'l Park, 364 B.R. at 821 (quoting In re Nichols II, 223 B.R. 353, 359 (Bankr. N.D. Okla. 1998)).

[31] In re Auld, No. 14-20424, 2014 WL 2780302, at *7 (Bankr. D. Kan. June 11, 2014).

Case 18-11065    Doc# 129    Filed 11/06/18    Page 18 of 31

breach occurred when Karbank did not receive notice of the intended transfer in accord with the agreement. In the same order, the state court denied summary judgment on the remedy due Karbank because the court lacked facts necessary to make that determination. On March 29, 2018, Karbank filed a supplemental motion for summary judgment stating additional facts supporting its position that $912,444,84 was due on the loan held by Diversified when Debtor deeded the Property to Diversified, such that a remedy for breach of the Rights Agreement was for Karbank to acquire the Property for that amount. Neither Debtor nor Diversified responded, and on May 11, 2018, Karbank filed a motion to deem the supplemental motion submitted for decision. Karbank reasonably expected a ruling in the near future that it was entitled to purchase the Property for approximately $912,000.

Debtor responded by filing a petition for relief under Chapter 11 on June 1, 2018. Standing alone, this timing is suspicious, but the actions taken before the filing leave no doubt of Debtor's intent to thwart Karbank's obtaining the Property under the terms of the Rights Agreement. Because when the state court found that Debtor had breached the Rights Agreement, Diversified, not Debtor, owned the Property, the full benefit of the Bankruptcy Code would not have been obtained if Debtor had simply filed for bankruptcy relief. Therefore,

19

Debtor and Diversified developed a clever plan to make bankruptcy protection more effective. They arranged to transfer the Property to Debtor, without Debtor being required to fund the transfer. Although throughout the state-court litigation Debtor and Diversified, who were represented by the same counsel, consistently took the position that the transfer by deed-in-lieu of foreclosure from Debtor to Diversified was a valid transaction, on May 30, 2018, they executed a settlement agreement stating that Debtor had a cause of action for fraudulent transfer against Diversified arising from the deed-in-lieu transaction and that the dispute would be settled by transferring the Property to Debtor. A limited warranty deed accomplishing that transfer was filed on May 30, 2018.[32] Debtor, now the owner of the Property, filed its Chapter 11 petition the next day. As a result, the Property was arguably property of the bankruptcy estate and the stay extended to the Property, as well as to Debtor.

Apart from the transactions with Karbank and Diversified related to the Property and the state-court case, Debtor had no reason to file for bankruptcy relief. No creditors were pressing for payment. It had no federal tax liability. Since in 2015 Diversified had purchased Debtor's note secured by the Property

---

[32] Karbank contends, as further evidence of bad faith, that this transfer was fraudulent, in violation of an order of the Johnson County District Court, and contrary to the oral representation made by counsel for Debtor and Diversified at the hearing on the request for injunction. The Court declines to make any findings on this contention.

and in 2016 Debtor had given Diversified a deed-in-lieu of foreclosure, Debtor had no secured debt to restructure. Debtor's largest unsecured debt was owed to an insider. Debtor has no business to reorganize and no valuable assets, until Diversified conveyed the Property to Debtor on the day before the filing of the petition.

The motions filed by Debtor in this case further confirm that the purpose when filing the bankruptcy was to preclude enforcement of remedy for breach of the Rights Agreement. On July 11, 2018, Debtor filed a motion to reject the Rights Agreement and the Parking Lot Lease under § 365. On the same day, Debtor also filed a motion to establish bid procedures for sale of the Property under § 363.

The testimony supports the conclusion that the transactions evidence intent to escape the remedy to be imposed by the state court. Craig McElvain confirmed that there were no discussions about Diversified transferring the Property back to Debtor until after the state-court's finding that Debtor had breached the Rights Agreement.[33] David Christie, on whose advice Debtor and Craig McElvain relied with respect to the Property transactions, testified in a

---

[33] Doc. 109 at 41(transcript of August 15, 2018 trial).

deposition that he would do whatever he could within the confines of the law to "make sure that the Karbank family does not own [the] property."[34]

This case falls within the category of bad faith cases labeled "'new debtor syndrome,' where property is transferred to a new entity and the new entity is placed in a Chapter 11 case for the purpose of defeating creditors' remedies under state law."[35] It is similar to Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.).[36] In that case, two individuals purchased land from Baker Farms, giving the seller a note and mortgage for most of the purchase price. Default occurred, and a foreclosure action was filed. The foreclosure court entered a final judgment in favor of Baker Farms in the amount of $841,141.50 and provided, if the judgment was not paid within three days, the property would be sold at public sale. On the day the judgment was entered, the individuals sold the property to Natural Land, allegedly for $1,000,000, and Natural Land promptly filed for relief under Chapter 11, resulting in a stay of the foreclosure suit. Baker Farms moved to dismiss for lack of good faith. The bankruptcy court found that Natural Land was a mere shell, paid nothing for the property (other than assuming the

---

[34] Id. at 158.

[35] In re Forest Hill Funeral Home and Mem'l Park, 362 B.R. at 820.

[36] 825 F.2d 296 (11th Cir. 1987).

22

foreclosure judgment debt and giving a note), and had misused the bankruptcy process.  The dismissal was appealed to the district court, which affirmed, and then to the Eleventh Circuit, which also affirmed.  It stated:

> The district court found that Natural Land acquired the subject property on the very date the state court entered its foreclosure order, certainly an event to be viewed with some suspicion. Furthermore, the court found that Natural Land never had any paid employees, that it had never previously engaged in business, that it had no legitimate creditors (other than those it acquired when it bought the subject property), and that it had held no assets until it acquired the subject property. Based on these findings, the court concluded that Natural Land had filed its petition for reorganization merely to frustrate Baker Farms' collection efforts. We find nothing in the record that leads us to doubt these conclusions, and therefore affirm the dismissal of Natural Land's petition for reorganization.[37]

In this case, the Property was conveyed to Debtor solely for the purpose of thwarting Karbank's recovery in the state-court litigation. When the state court made its ruling, the Property was owned by Diversified, but Debtor was a party to the Rights agreement.  Debtor's bankruptcy could not effectively thwart Karbank's anticipated judgment unless Debtor also owned the Property.  But Debtor had no assets and no source of credit to enable it to purchase the Property, so the fraudulent transfer settlement was created to

---

[37]  825 F.2d at 298–99.

23

enable Debtor to acquire title to the Property without payment. The stated consideration was settlement of an alleged claim that the 2016 deed-in-lieu transfer of the Property to Diversified was fraudulent, but that contention is diametrically opposed to the positions that Debtor and Diversified had taken during the two year state-court litigation, where both Debtor and Diversified argued that the transfer was a bona fide transfer by deed in lieu of foreclosure.

The Court concludes that Karbank has shown that Debtor's case was not filed in good faith. There is nothing sinister in Debtor's attempt to use the Bankruptcy Code to evade the state-court ruling. Other than success on rehearing or appeal of the state-court ruling, it was only avenue available to Debtor at the time to possibly realize the full value of the Property. However, the interpretation of the Bankruptcy Code and the facts of this case require a bad faith finding.

### 2. Debtor has not sustained its burden to prove good faith.

To justify the prepetition transfer of the Property from Diversified to Debtor immediately before the Chapter 11 petition was filed, Debtor states that it "ultimately recognized that the value of the Property grossly exceeded"[38] the approximately $909,000 paid by Diversified to obtain the note and mortgage from Bank. But Debtor had known the value exceeded the debt

_____

[38] Doc. 29 at 2.

when the transfer was made in 2016. The November 1, 2015 listing agreement whereby Diversified Development Associates was granted the exclusive right to market and sell the Property listed the price of $1.5 million. Further, the understanding was that when the Property was sold, Diversified/David Christie would recover their purchase price and costs, with the remainder going to Debtor.[39]

Debtor contends its "motives in filing this case are ultimately to obtain the highest and best price available [for the Property] for the benefit of third party creditors."[40] Of course, thwarting of Karbank's remedy for Debtor's breach of the Rights Agreement is an inherent consequence of a sale within the bankruptcy case. To argue that Debtor intended only to benefit third party creditors is not credible. Debtor's contention ignores the fact that it had no creditors who were pressing Debtor for payment before the bankruptcy was filed. It also ignores the fact that Diversified has filed a secured proof of claim for $1,323,565.28. Assuming a sale in the bankruptcy case, after payment of Diversified's claim, Karbank's claim, real estate taxes, the costs of sale, and the administrative claims, there would be little left for other creditors.

---

[39] Doc. 109 at 134.

[40] Doc. 29 at 8.

25

Further, review of the schedules negates the contention that the petition was filed in good faith. Debtor's only asset of any significance is the Property.[41] Debtor's Schedule A/B lists additional assets of $727.64 cash, accounts receivable of approximately $7,000, no investments, no inventory, and $30,000 of office equipment. David Christie donated $20,000 to Debtor for attorneys fees and costs of filing the bankruptcy. Debtor has insufficient income to fund a Chapter 11 case. Debtor's statement of financial affairs reports income from donations (not from operations of a business) of $1,727.34 for the portion of 2018 prior to filing, $29,106.44 for 2017, and $95,713.50 for 2016. Debtor's postpetition income for July, 2018 was donations of $2757.15.

Debtor is not a candidate for rehabilitation under Chapter 11. Debtor is not conducting any business. It has not utilized the Property for over two years. Debtor's only expenses for July, 2018 were $487, comprised of mowing services, the U S. Trustee fee, and small service fees. Craig McElvain on behalf of Debtor continues to offer an unaccredited seminary program and to seek to plant house parishes, but apparently these activities do not generate income or require expenditures.

---

[41] Karbank contends that the May 30, 2018 transfer from Diversified to Debtor was fraudulent and in violation of a state-court injunction, so the Debtors's interest is only bare legal title.

26

Debtor has no employees.  Craig McElvain is the executive director of Debtor.  He is not being paid a salary.  There is no evidence of other individuals who would be considered employees.

Debtor has few creditors.  Only twelve proofs of claim have been filed, and the bar date is past. Debtor's primary creditors are Diversified and Karbank. Diversified asserts a claim for approximately $1,320,000, secured by the Property.  Karbank has filed a claim for an unknown amount based upon the Parking Lot Agreement and the Rights Agreement.  There are three unsecured claims totaling approximately $104,000 for loans from individuals associated with Debtor who financed the down payment when the Property was purchased by Debtor in 2012. Craig McElvain, an insider, has filed an unsecured claim for approximately $220,000, apparently for money loaned. There are no trade creditor claims.  The only tax claim is for approximately $65,000 for 2017 real estate taxes.  The only claim related to the conduct of business is approximately $13,000 due on a copier lease.  There are two claims for wages earned totaling approximately $69,000.  A former tenant of the Property filed a claim for $4,299 for return of a security deposit.

Debtor has not shown that this case was filed in good faith.

27

### 3. This case should be dismissed rather than converted to Chapter 7.

To the extent this Court's finding that this case was not filed in good faith constitutes "cause" under § 1129(b), the Court is directed to consider whether dismissal or conversion to Chapter 7 is in the best interests of creditors and the estate. The Code does not define the phrase best interests of creditors and the estate. The standard "implies a balancing test to be applied through case-by-case analysis. In the end the determination is a matter for sound judicial discretion."[42] The Court must consider the impact of each option.[43]

A respected commentator identifies ten factors for consideration. They are:

> (1) whether some creditors received preferential payments, whether equality of distribution would be better served by conversion rather than dismissal; (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (3) whether the debtor would simply file a further case upon dismissal; (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors; (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise; (6) whether any

---

[42] In re Staff Inv. Co., 146 B.R. 256, 260 (Bankr. E.D. Ca. 1992).

[43] Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.), 14 F.3d 240, 243 (4th Cir. 1994).

remaining issues would be better resolved outside the bankruptcy forum; (7) whether the estate consists of a "single asset,"; (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests; (9) whether a plan has been confirmed and whether any property remains in the estate to be administered; and (10) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.[44]

An affirmative answer to the first five factors would support conversion rather than dismissal, but the circumstances identified in those factors are not present in this case. Rather, factors six and seven are relevant and support dismissal. The issues in this case concerning rights in the Property and the Rights Agreement are better determined by the state court, where litigation of these matters has been pending for two years. As to factor seven, this is a single asset case and, more importantly, is a two party dispute about that asset. As to factor eight, although Debtor engaged in misconduct, in the sense that the case was not filed in good faith, such conduct has not created a need for protecting creditors through use of Chapter 7. As to factor nine, a plan has not been confirmed. There is no prospect of rehabilitation, and liquidation in Chapter 7 would provide little, if any, benefit to creditors. The answer to

--------

[44] 7 Collier on Bankruptcy at ¶ 1112.04[7].

factor ten is no. Appointment of a Chapter 7 Trustee to supervise the estate does not appear desirable, and there are no environmental or safety concerns.

After considering the alternatives, the Court finds that dismissal is in the best interests of creditors and the estate. This is a two party dispute. The bankruptcy was filed as a litigation tactic to thwart Karbank's recovery in the state-court litigation. Dismissal will allow Karbank to seek the remedy to which it is entitled under the Rights Agreement without having to litigate the bankruptcy roadblocks which Debtor would erect if this case were not dismissed.

**4.      Cause exists to grant Karbank's motion for relief from stay.**

Karbank moved to dismiss this case, or in the alternative, for relief from stay. Generally, courts hold that "the filing of a Chapter 11 case in bad faith is 'cause' for termination of the automatic stay under § 362(d)(1)."[45] If this case were not dismissed, Karbank would be entitled to relief from stay.

## IV.   Conclusion

For the foregoing reasons, the Court finds that this case was not filed in good faith. The transfer of the Property from Diversified to Debtor shortly before the expected ruling in the state court granting Karbank a remedy for Debtor's breach of the Rights Agreement and Debtor's filing of the Chapter 11

---

[45] In re Pacific Rim Inv., LLP, 243 B.R. at 772.

petition the following day were a creative plan to thwart Karbank's recovery. But that plan has the characteristics of a "new debtor syndrome" bad faith filing.  The case is therefore subject to dismissal as not having been filed to accomplish the purposes of the Bankruptcy Code.

## Judgment

Judgment is hereby entered granting Karbank Holdings, LLC's Motion to Dismiss. The judgment based on this ruling will  become effective when it is entered on the docket for this case, as provided  by Federal Rule of Bankruptcy Procedure 9021.

**It is so Ordered.**

###